No. 3041

Second Circuit

## BOSSIER STATE BANK v. HAMNER AND SMITH

(November 10, 1927.  Opinion and Decree.)
(December 21, 1927.  Rehearing Refused.)

*(Syllabus by the Court)*

1. Louisiana Digest—Suretyship—Par. 27, 38, 61; Subrogation—Par. 6.

The surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety.

Civil Code, Article 3061.

2. Louisiana Digest—Subrogation—Par. 6; Suretyship—Par. 27, 38, 61.

When a creditor receives property from a debtor for the payment of a debt for which security has been given, it is the duty of the creditor to hold the same impartially for the joint benefit of himself and surety.  He has no right to dispose of it without the surety's consent.  If the creditor, therefore, does any act without the surety's consent, which impairs his rights of subrogation, or the means of enforcing his claim against the principal in case he should pay the debt, the surety will be discharged.

New England L. Co. vs. Randall, 42 La. Ann. 260, 7 South. 679.

Appeal from the Twenty-sixth Judicial District Court of Louisiana, Parish of Bossier.  Hon. Harmon C. Drew, Judge.

Action by Bossier State Bank against E. B. Hamner and G. W. Smith.

There was judgment for defendants and plaintiff appealed.

Judgment affirmed.

Robert Roberts, Jr., of Shreveport, attorney for plaintiff, appellant.

J. G. Palmer, of Shreveport, attorney for defendants, appellees.

## STATEMENT OF THE CASE

REYNOLDS, J.  Plaintiff sued defendants for the sum of $320.00 with 8% interest thereon from December 11, 1925, until paid, and 10% on the amount of principal and interest, as attorney's fees, subject to a credit of $80.00 paid April 22, 1926, on a promissory note for the sum of $320.00, signed by the defendants and J. G. McDade, in solido, dated October 26, 1925, due December 11, 1925, bearing 8% interest from its maturity until paid, payable to the order of palintiff, stipulating payment of 10% attorney's fees, and on which is endorsed the following credit: "Paid on within note $80.00.  Mc-Dade.  4/22/26."

Judgment by default was entered against Hamner.

Smith answered, admitting execution and delivery of the note, but denied liability thereon; and, as a special defense, set up that, to the knowledge of plaintiff, he and McDade received no part of the consideration for the note and were merely sureties thereon; that at the time of the execution and delivery thereof, by agreement between plaintiff, Hamner, McDade and himself, Hamner deposited with plaintiff certain negotiable instruments belonging to himself of a value exceeding in amount the debt represented by the promissory note to secure McDade and himself against loss by reason of their suretyship, and that plaintiff, without the knowledge or consent of McDade or himself, had surrendered possession of the instruments to Hamner who had collected the debts represented thereby and converted the proceeds to his own use, and that the act of the plaintiff remitted the debt represented by the note to Hamner and discharged McDade and himself as sureties thereto.

The default against Hamner was proved up, and the case went to trial quo ad Smith on his answer.

The District Court rendered judgment in favor of the plaintiff as prayed for and Smith appealed.

## OPINION

It is alleged in Smith's answer—

"that defendant, G. W. Smith, and the said J. G. McDade, were merely sureties on said note, and that, for their protection in the premises, it was agreed that the said E. B. Hamner, who was and is the principal in said note, would deposit at that time with plaintiff a sufficient number of promissory notes then owned and held by said Hamner, and due and payable by sundry solvent persons, and aggregating in amount a sum in excess of $500.00; and that with this agreement and understanding the said Hamner, then and thereupon, delivered to the plaintiff, Bossier State Bank, the said notes for the purpose herein stated, and that the delivery to the said Bossier State Bank of said notes by the said Hamner was caused to be made by the defendant, G. W. Smith, and the said J. G. McDade for their protection, and with the agreement between all parties in interest that the same constituted a part and parcel of the transaction then being consummated just as much as did the signing of the note sued on."

And also that—

"the said Bossier State Bank, plaintiff herein, without his knowledge or consent, and without the knowledge or consent of the said J. G. McDade, and upon its own responsibility, returned to the said E. B. Hamner all of the said notes * * * in absolute violation of the agreement between all the parties in interest, and thereafter the said Hamner proceeded to collect all of the said notes, or at least a sufficient number to receive therefrom a sum in excess of the debt herein sued on."

And that the conduct of the plaintiff amounted to appointing

"Hamner its agent and representative for the handling and collection of said notes, or a sufficient amount thereof to pay the debt herein sued on, and that such collection amount in law to a payment in full of the note."

J. G. McDADE testified (testimony, p —):

"Q. Mr. McDade, you are one of the signers of the note sued on in this case?
"A. Yes, sir.
"Q. You are not sued, of course—were you present when the note was executed?
"A. Sure; yes, sir.
"Q. Where was it signed, Mr. McDade?
"A. In the bank there, was not an office, out in front at Mr. Prince's desk in one of the rooms there.
"Q. Dr. Prince is president of the bank?
"A. Yes, sir.
"Q. Well, who was present when the note was signed?
"A. Dr. Prince, Mr. Hamner, Mr. Smith and myself.
"Q. All right—did Mr. Hamner have any personal notes of his?
"A. Mr. Hamner—yes, sir; he had some notes on some parties he had sold trees to, he said.
"Q. Did he take any out of his pocket?
"A. Yes, sir; he took them out there.
"Q. How many did he take out?
"A. I don't remember how many there were.
"Q. What did they aggregate?
"A. Something like five hundred and thirty-six or five hundred and thirty-eight dollars, one or the other.
"Q. Who did he hand these notes to when he took them out of his pocket?
"A. Put them down, and when Dr. Prince came in he handed them to him.

* * *

"Q. Was anything said there between all of you as to what those notes that Hamner was putting up there at that time stood for?
"A. They were—Mr. Hamner put them up there—
"Q. When Mr. Hamner took the notes out of his pocket was Dr. Prince present and heard all of the conversation that took place?
"A. Yes, sir.
"Q. Did he take part in it?
"A. Yes, sir, all there talking about these things; told him was going to leave those notes there for our protection.
"Q. For your protection?
"A. Mr. Hamner was going to turn the notes over to him, leave them at the bank for our protection, and we were to sign

the note for his protection; when those notes were collected they were to pay this three hundred and twenty dollars. Twenty dollars was interest.

"Q. You all then, you and Mr. Smith, had already talked the matter over with Dr. Prince before you actually met and signed the note?

"A. That morning; yes, sir.

"Q. Now what did you tell him you were going to have Hamner turn the notes over for?

"A. Hamner was to come in and turn the notes over for our protection; to protect us from having to pay the note what they were for.

"Q. Did you tell him that?

"A. Yes, sir.

* * *

"Q. Did you ever consent for those notes to be turned over to Mr. Hamner?

"A. No, sir; was never asked about it.

"Q. When they were turned over, they were turned over without your knowledge or consent?

"A. Yes, sir.

* * *

"Q. Everything that you did in this matter was for the accommodation of Mr. Hamner?

"A. Yes, sir, strictly; I never got a dollar out of it.

"Q. That is, at his request; at the same time you had previously accommodated him and thereby became obligated to the other company and the proceeds of this note went to discharge that prior obligation?

"A. Yes, sir; I think so."

Dr. S. E. Prince, president of the plaintiff bank, testified (testimony, p. —):

"Q. Dr. Prince, you are president of the Bossier State Bank of Bossier City, Louisiana?

"A. Yes, sir.

* * *

"Q. Were you present when the note sued on in this case was signed?

"A. Yes, sir.

"Q. With whom were these negotiations carried on?

"A. Me—myself.

"Q. I presume, of course, that at that time there were present also Mr. E. B. Hamner, G. W. Smith and J. G. McDade?

"A. Yes, sir.

"Q. Was Mr. Emmons, the cashier, present?

"A. No, sir.

* * *

"Q. Dr. Prince, did Mr. Hamner at that time deliver to you any notes which he owned and which were due him by sundry parties?

"A. No, sir; he never.

* * *

"Q. Were there any notes of any kind Mr. Hamner left with you?

"A. Yes, sir.

"Q. Who delivered them to you?

"A. Mr. Smith delivered them to me.

* * *

"Q. You are certain of that, doctor, is it not a fact that Mr. Hamner—

"A. He went outside the bank and got the notes I suppose from Mr. Hamner; Mr. Hamner followed him in, but Smith delivered the notes to me.

* * *

"Q. Doctor, what did you take those notes for?

"A. For collection.

"Q. For what purpose?

"A. For Smith's security; I never accepted them as security for the bank.

"Q. Security for Smith for what?

"A. For this loan he and Hamner had made.

"Q. Mr. McDade also made it?

"A. Yes, sir.

* * *

"Q. But it was primarily Hamner's obligation?

"A. I suppose so.

* * *

"Q. The check that you issued them for this three hundred and twenty dollars was made payable to Hamner?

"A. Yes, sir; made payable, as well as I remember, the cashier's check was made payable to a nursery, and Smith and McDade had signed his bond.

* * *

"Q. Then they came to the bank and signed this note as his security to enable him to get the money with which to pay that obligation—that is correct?

"A. Yes, sir.

* * *

"Q. Now you say Mr. Smith delivered to you certain personal notes of Mr. Hamner which he delivered to you as his protection against any loss he might sustain should he be called upon to pay this note sued on?

"A.  Mr. Smith and Mr. Hamner had an agreement between themselves—these notes were never accepted as collateral to the Bossier State Bank, never.

"Q.  Let's take it that way then—Smith and Hamner had an understanding that Hamner—

"A.  That Hamner was to leave the notes there for collection.

"Q.  Well, you say Mr. Hamner didn't leave them, Mr. Smith left them?

"A.  Well, I suppose that Hamner agreed with Smith to leave them.

"Q  Who actually left them with you?

"A.  Smith.

"Q.  For what purpose?

"A.  For—well to be placed—to be placed to Hamner's credit, the idea was to pay the note if collected.

"Q.  In other words, it was to keep Smith from sustaining ultimately any loss on account of signing that note?

"A.  Yes, sir.

"Q.  What, you don't remember the amount of those notes?

"A.  No, sir; I don't remember.

"Q.  You do recall it was something around five hundred dollars?

"A.  Something in that neighborhood; yes, sir.

"Q.  What became of those notes?

"A.  Hamner came back and got them.

*  *  *

"Q.  Well, did Mr. Smith authorize you or Mr. Emmons to return the notes to Mr. Hamner?

"A.  They were Hamner's notes.

"Q.  That is not the question, doctor; did Mr. Smith authorize you or Mr. Emmons or anybody else in authority in the bank to return the notes to Mr. Hamner?

"A.  No, sir.

"Q.  Did not?

"A.  No.

"Q.  Then you or the bank returned the notes to Mr. Hamner without the knowledge or consent of Mr Smith?

"A.  Yes, sir.

"Q.  Were the notes returned to Mr. Hamner without the knowledge or consent of Mr. McDade?

"A.  Yes, sir; so far as I know, he didn't know it."

Both Hamner and Smith also testified and their testimony also is to the effect that Smith and McDade only signed the note as sureties and that the negotiable instruments belonging to Hamner deposited with the plaintiff at the time were to secure Smith and McDade against loss by reason of their having signed the note and that the negotiable instruments were surrendered by the plaintiff to Hamner without the knowledge or consent of either Smith or McDade.

Article 3061 of the Civil Code provides that:

"The surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety."

Smith and McDade only signed the note as sureties and the plaintiff knew it at the time it accepted the note.

The negotiable instruments belonging to Hamner were deposited with the plaintiff to secure Smith and McDade against loss by reason of their suretyship and were to be collected and the money realized thereby was to be applied to the payment of the note.

The plaintiff, without the knowledge or consent of the sureties  surrendered the instruments to Hamner.

This act of the plaintiff, in our opinion, discharged the sureties.  The instruments were deposited with the plaintiff primarily to be collected and their proceeds applied to the payment of the note, and it was its duty not to dispose of them without the knowledge and consent of the sureties, but to hold them impartially for its own and the sureties' benefit.

New England Mut. L. I. Co. vs. Randall, 42 La. Ann. 261, 7 South. 679.

As said by the court in Hill & Co. vs. Bourcier and Pond, 29 La. Ann. 841:

"If by the act of the creditor, or his wilful neglect or want of proper diligence, any of the securities, rights, mortgages, and

privileges by which the debt was secured, are lost, so that they can no longer be made available, the surety is discharged to the extent of their value."

But plaintiff contends that Smith and McDade were not sureties but principals. The evidence of plaintiff's own witnesses shows otherwise, however.

Even if they were principals and not sureties, plaintiff would not be in any better case, for Article 2203 of the Civil Code provides that:

"The remission or conventional discharge in favor of one of the co-debtors in solido, discharges all the others, unless the creditor has expressly reserved his right against the latter.

"In the latter case, he cannot claim the debt without making a deduction of the part of him to whom he has made the remission."

And plaintiff remitted the debt in favor of one of the co-debtors in solido, McDade.

Doctor S. E. Prince, president of plaintiff, testified, (Evidence, page 8):

"Q. Didn't you release Mr. McDade in this case on payment of just one-half or one-fourth?

"A. Yes, sir; offered to compromise to keep from having a law suit."

And J. G. McDade testified, (Evidence, page 29):

"I paid Dr. Prince; Dr. Prince and I compromised; he came to me and offered to compromise, and I told him I would take that rather than have a law suit."

This evidence was introduced without any objection thereto on the part of the plaintiff and consequently the pleadings were enlarged pro tanto.

"A party who, without opposition, suffers evidence to be adduced contrary to or beyond the allegations contained in the pleadings is bound by its effect."

Hennen vs. Gilman, 20 La. Ann. 241.

Nusbaum vs. Marks, 20 La. Ann. 379.

Nor is there anything in the Uniform Negotiable Instruments Law (Act No. 64 of 1904) that abrogates the codal provision quoted.

"There is nothing in Act No. 64 of 1904 (known as the Negotiable Instruments Act) which operates the abrogation or repeal, as to negotiable instruments, of Article 2203 of the Civil Code, which declares that the 'conventional discharge in favor of one of the co-debtors in solido discharges all the others, unless the creditor has expressly reserved his rights against the latter'."

J. I. Case T. Mach. Co. vs. Bridger, 133 La. 754, 63 South. 319.

The law and the evidence convinces us that the judgment appealed from is correct and accordingly it is affirmed.